Case No. 12-2536

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN,
a Michigan non-profit corporation

*Plaintiff-Appellant*

vs.

FEDERAL BUREAU OF INVESTIGATION, AND
UNITED STATES DEPARTMENT OF JUSTICE

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Eastern District of Michigan
Southern Division
Case No. 2:11-cv-13154

---

**BRIEF FOR PLAINTIFF-APPELLANT**

---

Nusrat J. Choudhury
Hina Shamsi
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7876

Mark P. Fancher
Michael J. Steinberg
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6822

Stephen C. Borgsdorf
Dykema Gossett PLLC
2723 South State
  Street, Suite 400
Ann Arbor, MI 48104
(734) 214-7663

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6 Cir. R. 26.1, Plaintiff-Appellant American Civil Liberties

Union of Michigan makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party.

    No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest.

    No.

February 1, 2013                                    Respectfully submitted,
                                                     /s/ Nusrat J. Choudhury
                                                     Nusrat J. Choudhury
                                                     National Security Project
                                                     American Civil Liberties Union
                                                       Foundation
                                                     125 Broad Street, 18th Floor
                                                     New York, NY 10004
                                                     P: (212) 519-7876
                                                     F: (212) 549-2654
                                                     nchoudhury@aclu.org

                                                     *Attorney for Plaintiff-Appellant*
                                                     *American Civil Liberties Union of*
                                                     *Michigan*

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ........................................................3

**STATEMENT REGARDING ORAL ARGUMENT** ..........................8

**STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION** ....................................................................9

**STATEMENT OF ISSUES** ......................................................9

**STATEMENT OF THE CASE** ................................................10

**STATEMENT OF FACTS** .....................................................11

   I)     The FBI's Racial and Ethnic Mapping Program ............................11

   II)    The FOIA Request.................................................15

   III)   The Cross-Motions for Summary Judgment ..................................16

**SUMMARY OF THE ARGUMENT** ......................................20

**ARGUMENT** ....................................................................24

   I)     FOIA and the Standard of Review ...............................24

   II)    The District Court Erred in Allowing the FBI to Keep Secret Publicly-Available Racial and Ethnic Information About Michigan Communities ..............27

      A)    Exemption 7A does not permit withholding publicly-available racial and ethnic information about Michigan communities because disclosure cannot reasonably be expected to harm investigations ....................................30

      B)    Exemption 1 cannot justify withholding publicly-available racial and ethnic information about Michigan communities because disclosure will not plausibly harm national security.........................................36

      C)    Defendants failed to meet their burden to segregate and disclose non-exempt, publicly-available racial and ethnic information about Michigan communities.........................................................42

III)    This Court Should Establish a Fair and Transparent Process for Adjudicating Disputes Over an Agency's Possible Reliance on a FOIA Exclusion...................................................................................................45

   A)    Adjudication of the Section 552(c) dispute through a Glomar-like process will permit meaningful judicial review and protect the interests of the litigants and the public ...............................................................46

   B)    The district court's use of secret proceedings prohibits meaningful judicial review and fails to protect the interests of the litigants and the public ....52

**CONCLUSION**...........................................................................................57

**CERTIFICATE OF COMPLIANCE** ...................................................60

**CERTIFICATE OF SERVICE** .............................................................61

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS** ...........62

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abdelfattah v. U.S. Dep't of Homeland Sec.*,
   488 F.3d 178 (3d Cir. 2007) ...................................................................42

*Akron Standard Div. of Eagle-Picher Indus., Inc. v. Donovan*,
   780 F.2d 568 (6th Cir. 1986) .................................................................24

*Bassiouni v. C.I.A.*,
   392 F.3d 244 (7th Cir. 2004) .................................................................47

*Benavides v. Drug Enforcement Agency*,
   968 F.2d 1243 (D.C. Cir. 1992)..............................................................46

*Boyd v. Criminal Div. of the U.S. Dep't of Justice*,
   475 F.3d 381 (D.C. Cir. 2007)...............................................................29

*Campbell v. U.S. Dep't of Health & Human Servs.*,
   682 F.2d 256 (D.C. Cir. 1982) ......................................................... 26, 32

*Crooker v. Bureau of Alcohol, Tobacco & Firearms*,
   789 F.2d 64 (D.C. Cir. 1986)................................................................25

*Dep't of the Air Force v. Rose*,
   425 U.S. 352 (1976)..............................................................................53

*Dickerson v. U.S. Dep't of Justice*,
   992 F. 2d 1426 (6th Cir. 1993) ............................................... 29, 30, 43

*Farrar v. Cain*,
   642 F.2d 86 (5th Cir. 1981) ..................................................................50

*Gardels v. C.I.A.*,
   689 F.2d 1100 (D.C. Cir. 1982)........................................... 31, 32, 35

*Goldberg v. U.S. Dep't of State*,
   818 F.2d 71 (D.C. Cir. 1987)................................................................32

*Granite Auto Leasing Corp. v. Carter Mfg. Co.*,
   546 F.2d 654 (5th Cir. 1977) ................................................................53

*Hassan v. New York*,
   No. 2:12-cv-03401 (D.N.J. Oct. 3, 2012) ............................................................13

*Johnson v. Sherry*,
   586 F.3d 439 (6th Cir. 2009) .................................................................................54

*Jones v. F.B.I.*,
   41 F.3d 238 (6th Cir. 1994) ........................................................................... 24, 31

*Jones v. Morris*,
   777 F.2d 1277 (7th Cir. 1985) ...............................................................................50

*Kamakana v. City and Cnty. of Honolulu*,
   447 F.3d 1172 (9th Cir. 2006) ...............................................................................54

*King v. U.S. Dep't of Justice*,
   830 F.2d 210 (D.C. 1996) ......................................................................................30

*Kuzma v. I.R.S.*,
   775 F.2d 66 (2d Cir. 1985) ....................................................................................52

*Lamont v. U.S. Dep't of Justice*,
   475 F. Supp. 761 (S.D.N.Y. 1979) ........................................................................40

*Lykins v. Dep't of Justice*,
   725 F.2d 1455 (D.C. Cir. 1984).............................................................................25

*Manna v. U.S. Dep't of Justice*,
   51 F.3d 1158 (3d Cir. 1995) ........................................................................... 25, 29

*Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*,
   566 F.2d 242 (D.C. Cir. 1977)....................................................................... 41, 42

*Minier v. C.I.A.*,
   88 F.3d 796 (9th Cir. 1996) ...................................................................................47

*Nixon v. Warner Commc'ns, Inc.*,
   435 U.S. 589 (1978)....................................................................................... 54, 55

*NLRB v. Robbins Tire & Rubber Co.*,
   437 U.S. 214 (1978)...............................................................................................23

*Phillippi v. C.I.A.*,
    546 F.2d 1009 (D.C. Cir. 1976)................................................................. passim

*Powell v. U.S. Bureau of Prisons*,
    927 F.2d 1239 (D.C. Cir. 1991)..........................................................43

*Press-Enter. Co. v. Super. Ct. of Cal.*,
    464 U.S. 501 (1984)................................................................... 54, 55

*Roth v. U.S. Dep't of Justice*,
    642 F.3d 1161 (D.C. Cir. 2011)..........................................................47

*Rugiero v. U.S. Dep't of Justice*,
    257 F.3d 534 (6th Cir. 2001) ..................................................... passim

*Schell v. U.S. Dep't of Health & Human Servs.*,
    843 F.2d 933 (6th Cir. 1988) ..............................................................23

*U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*,
    532 U.S. 1 (2001)..............................................................................24

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973).................................................... 24, 47

*Wash. Post v. U.S. Dep't of Defense*,
    766 F. Supp. 1 (D.C. Cir. 1991)........................................................37

*Wiener v. F.B.I.*,
    943 F.2d 972 (9th Cir. 1991) .......................................................52, 53

*Wilner v. Nat'l Sec. Agency*,
    592 F.3d 60 (2d Cir. 2009) .......................................... 37, 38, 41, 47

*Wolf v. C.I.A.*,
    473 F.3d 370 (D.C. Cir. 2007)..........................................................48

**Statutes**

28 U.S.C. § 1292.................................................................................8

28 U.S.C. § 1331.................................................................................8

5

5 U.S.C. § 552 ....................................................................................7, 23

5 U.S.C. § 552(a)(3)(A) ...........................................................................24

5 U.S.C. § 552(a)(4)(B) ................................................................. 8, 25, 56

5 U.S.C. § 552(a)(6) ................................................................................24

5 U.S.C. § 552(b) ......................................................................... 8, 24, 41

5 U.S.C. § 552(b)(1) ..................................................................... 8, 25, 26

5 U.S.C. § 552(b)(7)(A) ......................................................................8, 25

5 U.S.C. § 552(c) ............................................................................ passim

5 U.S.C. § 552(c)(3) ..................................................................... 16, 45, 48

5 U.S.C. §§ 701-706 ................................................................................8

## Other Authorities

132 Cong. Rec. H9455-05 (daily ed. Oct. 8, 1986) .......................... 48, 56

132 Cong. Rec. S14270-01 (daily ed. Sept. 30, 1986) ...........................48

American Civil Liberties Union, Eye on the FBI: The FBI's Use of
    Anti-Arab and Anti-Muslim Training Materials (Oct. 20, 2011)........................13

Executive Order on Classified National Security Information,
    Exec. Order No. 13,526, 3 C.F.R. 298 (2009)......................................... 26, 36, 37

Fed. Bureau of Investigation, Domestic Investigations and
    Operations Guide (Dec. 16, 2008).........................................................11

Harry A. Hammit, et al., Litigation Under the Federal Open
    Government Laws 336 (2008) ................................................................46

John S. Pistole, Deputy Director, Fed. Bureau of Investigation,
    Statement Before the Senate Select Committee on Intelligence (Jan. 25, 2007) .13

Richard Winton & Teresa Watanabe, *LAPD's Muslim Mapping Plan Killed*,
    L.A. Times, Nov. 15, 2007 ...................................................................14

S. Rep. No. 111-6 (2009) ........................................................................14

Scott Shane and Lowell Bergman, *FBI Struggling to Reinvent Itself to Fight Terror*, N.Y. Times, Oct. 10, 2006 ....................................................13

U.S. Dep't of Justice, Guidance Regarding the Use of Race by Federal Law Enforcement Agencies (2003) ...........................................................11

U.S. Dep't of Justice, Office of the Inspector General, The Federal Bureau of Investigation's Compliance with the Attorney General's Investigation Guidelines (2005)..........................................................12

U.S. Dep't of Justice, The Attorney General's Guidelines for Domestic FBI Operations (2008) ..............................................................................11

**Rules**

Fed. R. Civ. P. 56(c)...............................................................................25

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant American Civil Liberties Union of Michigan appeals from a district court order permitting Defendants-Appellees Federal Bureau of Investigation and Department of Justice ("Defendants") to withhold under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, publicly-available information about Michigan populations.  It also appeals from the district court's use of a secret process to determine the propriety of any reliance by Defendants on the FOIA's exclusion provision, 5 U.S.C. § 552(c).  Because the government action challenged here involves improper and sweeping claims of secrecy that would, if upheld, shield publicly-available information from public view and set an important precedent for the process for adjudicating FOIA exclusion claims, Plaintiff requests oral argument.

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

The district court had jurisdiction over this action to enforce a request for agency records pursuant to the Freedom of Information Act, 5 U.S.C. § 552(a)(4)(B), as well as 5 U.S.C. §§ 701-706, and 28 U.S.C. § 1331.  On September 30, 2012, the district court granted summary judgment in favor of Defendants Federal Bureau of Investigation ("FBI") and U.S. Department of Justice ("DOJ") on all claims.  Plaintiff timely filed a Notice of Appeal of the district court's final judgment on November 27, 2012.  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Plaintiff's appeal presents the following issues:

1.  Whether publicly-available racial and ethnic information about Michigan communities may be kept secret from the public under FOIA Exemptions 7A and 1, 5 U.S.C. § 552(b)(1), (b)(7)(A), even though disclosure of this limited information could not reasonably be expected to harm law enforcement investigations and will not plausibly harm national security.

2.  Whether the district court erred as a matter of law by failing to discharge its obligation under the FOIA, 5 U.S.C. § 552(b), and controlling precedent of this Court to determine whether the FBI and DOJ disclosed non-exempt information that is reasonably segregable and must be disclosed from the withheld material.

3.  Whether Plaintiff's challenge to Defendants' reliance, if any, on the FOIA's exclusion provision, 5 U.S.C. § 552(c), in withholding information about the

FBI's racial and ethnic mapping program should be resolved through a procedure akin to the "Glomar procedure" established by the D.C. Circuit in *Phillippi v. C.I.A.*, 546 F.2d 1009 (D.C. Cir. 1976), which ensures meaningful judicial review and protects the interests of both litigants, rather than through an entirely secret process.

## STATEMENT OF THE CASE

This litigation involves a Freedom of Information Act request submitted by Plaintiff-Appellant American Civil Liberties Union of Michigan ("Plaintiff") for records relating to Defendant FBI's collection and use of Michigan communities' racial and ethnic information in an intelligence collection program known as Domain Management. Plaintiff filed the request on July 27, 2010 with the FBI's Detroit Field Office. The FBI partially released documents on December 22, 2010.

Plaintiff exhausted administrative remedies and filed suit to enforce the Request on July 21, 2011. It sought an injunction requiring Defendants FBI and DOJ to immediately process the Request, to conduct a thorough search for responsive information, and to release information unlawfully withheld. Defendants partially released certain additional records, moved to dismiss the FBI as a party to the action, and moved for summary judgment as to all claims. Plaintiff opposed the motion to dismiss and cross-moved for partial summary judgment.

10

On September 30, 2012, the district court granted Defendants' motion and denied Plaintiff's cross-motion. Plaintiff timely appealed the district court's ruling to this Court on November 27, 2012.

On appeal, Plaintiff pursues only its challenges to Defendants' improper withholding under Exemptions 7A and 1 of publicly-available information from 101 documents withheld in full and 40 documents withheld in part. Plaintiff also appeals the district court's use of a secret process for adjudicating its claim that Defendants improperly relied on the FOIA's exclusion provision, 5 U.S.C. § 552(c).

## STATEMENT OF FACTS

### I) The FBI's Racial and Ethnic Mapping Program

Over the past decade, three Department of Justice and FBI policies dramatically expanded the FBI's authority to investigate and collect intelligence about racial, ethnic, national origin, and religious communities in the United States. In 2003, DOJ issued its Guidance Regarding the Use of Race by Federal Law Enforcement Agencies ("Guidance on Race"), which permits racial and ethnic profiling in national security and border integrity investigations despite prohibiting

it in other contexts.[1]  In December 2008, DOJ issued revised Attorney General

Guidelines ("AGG"), which govern the FBI's conduct in criminal, national

security, and counterintelligence investigations, and which authorized

"assessments"—a new form of investigation that does not require any factual

predicate suggesting that the target is involved in illegal activity or poses a national

security threat.[2]  That same month, the FBI issued its Domestic Investigations and

Operations Guide ("DIOG"), an internal guide to implementing the AGG.[3]

The DIOG created a new intelligence program called "Domain

Management," which authorizes FBI agents to collect, map, and analyze racial and

ethnic demographic information, and to identify "concentrated ethnic

communities" and the location of "ethnic-oriented businesses" and other facilities

"if the[se] locations will reasonably contribute to an awareness of threats and

vulnerabilities" and "assist in intelligence analysis."  Ex. A to Declaration of

Nusrat J. Choudhury ("Choudhury Decl."), R. 24-2, at 32-33, Pg ID # 875-76 (Fed.

---

[1] U.S. Dep't of Justice, Guidance Regarding the Use of Race by Federal Law Enforcement Agencies 2 (2003), http://www.justice.gov/crt/about/spl/documents/guidance_on_race.pdf.

[2] U.S. Dep't of Justice, The Attorney General's Guidelines for Domestic FBI Operations (2008), http://www.justice.gov/ag/readingroom/guidelines.pdf  ("2008 Attorney General Guidelines").

[3] Fed. Bureau of Investigation, Domestic Investigations and Operations Guide (Dec. 16, 2008), *available at* http://tinyurl.com/ajtwk3q ("DIOG").

Bureau of Investigation, DIOG § 4.3(C)(2)). The DIOG also allows the FBI to collect and track "[s]pecific and relevant ethnic behavior," "behavioral characteristics reasonably . . . associated with a particular criminal or terrorist element of an ethnic community," and "behavioral and cultural information about ethnic or racial communities that is reasonably likely to be exploited by criminal or terrorist groups," including "cultural tradition[s]." *Id*. at 33-34, Pg ID # 876-77.

These policy documents loosened restrictions on FBI domestic investigative authority originally established in 1976 in response to revelations of widespread abuses, and raise grave civil rights and civil liberties concerns.[4] In particular, the FBI's power to map ethnic communities, collect and use information about "ethnic behavior[s]" and cultural tradition[s]," and to conduct race- and ethnicity-based investigations may lead to the illegal and unconstitutional profiling of communities for investigation and intelligence collection, including through suspicionless assessment investigations. Complaint, R. 1, ¶ 13, Pg ID # 4. This concern is concrete because the FBI uses the information about racial and ethnic communities

---

[4] The 1976 Attorney General Guidelines prohibited domestic investigations absent "specific and articulable facts" indicating criminal activity, and were instituted after Senate investigations chaired by Senator Frank Church revealed FBI targeting of people for First Amendment protected activities. U.S. Dep't of Justice, Office of the Inspector General, The Federal Bureau of Investigation's Compliance with the Attorney General's Investigation Guidelines 33-37 (2005), http://www.justice.gov/oig/special/0509/final.pdf.

collected through the Domain Management program to target further intelligence

collection.[5]  FBI officials themselves have expressed concern about the impact of

investigating communities on the basis of race and ethnicity on civil rights and

civil liberties.[6]  Similar "mapping" programs by local law enforcement agencies

have faced staunch opposition due to concerns that the programs lead to illegal

profiling.[7]

---

[5] *See* John S. Pistole, Deputy Director, Fed. Bureau of Investigation, Statement Before the Senate Select Committee on Intelligence (Jan. 25, 2007), *available at* http://tinyurl.com/brmhv9u ("domain management . . . provides the basis for investigative, intelligence, and management direction"); Ex. K to Hardy Decl., R. 19-2, at DE-GEOMAP 485, Pg ID # 582 ("Domain Management . . . enhance[s] [the FBI's] ability to . . . discover new opportunities for needed intelligence collection.").

FBI documents obtained through FOIA show that the Bureau has used biased and erroneous counterterrorism training materials portraying Arabs and Muslims as backwards, violent, and supporters of terrorism, heightening concerns about illegal profiling.  *See* American Civil Liberties Union, Eye on the FBI: The FBI's Use of Anti-Arab and Anti-Muslim Training Materials (Oct. 20, 2011), http://tinyurl.com/are4vfe.

[6] Scott Shane and Lowell Bergman, *FBI Struggling to Reinvent Itself to Fight Terror*, N.Y. Times, Oct. 10, 2006, http://tinyurl.com/bljk6t9.

[7] A New York Police Department program to map and create dossiers on Muslims' places of work and worship without suspicion of criminal activity is currently the subject of a federal lawsuit challenging the program for unconstitutional and discriminatory religious profiling.  First Amended Complaint ¶ 1-7, *Hassan v. New York*, No. 2:12-cv-03401, ECF No. 10 (D.N.J. Oct. 3, 2012). The Los Angeles Police Department abandoned a plan to "map" Muslim communities by race and religion due to public concern that the program would

In 2009, the FBI's then General Counsel acknowledged to Congress that the DIOG's expansion of FBI powers raises civil liberties concerns.  S. Rep. No. 111-6, at 34 (2009).  She stated that the FBI would reassess its racial and ethnic mapping authority after a year based on its implementation and "comments and suggestions" from Congress and others.  *Id.*

## II) The FOIA Request

In 2010, Plaintiff filed the FOIA request at issue in this case with the FBI's Detroit Field Office to inform Michigan communities about the lawfulness of the FBI's use of its DIOG authorities in this state, and to foster the public comment on the DIOG invited by the FBI.  Declaration of Mark Fancher ("Fancher Decl."), R. 24-17, ¶ 3, Pg ID # 1049; Ex. A. to Fancher Decl., R. 24-18, Pg ID # 1053-54, 1056.  The Request seeks records concerning the FBI's collection, mapping, and use of Michigan communities' racial or ethnic information, and the maps themselves.  Ex. A. to Fancher Decl., R. 24-18, Pg ID # 1054-55.  After receiving a partial release of records and exhausting administrative remedies, Plaintiff filed this action to enforce the Request.  Complaint, R. 1, Pg ID # 1-15.

---

lead to profiling.  Richard Winton & Teresa Watanabe, *LAPD's Muslim Mapping Plan Killed*, L.A. Times, Nov. 15, 2007, http://tinyurl.com/nyjwe9.

### III)    The Cross-Motions for Summary Judgment

Defendants moved for summary judgment and submitted the Declaration of David M. Hardy ("Hardy Decl.") to support their secrecy claims.  Defs.' Motion for Summ. J., R. 19, Pg ID # 62; Declaration of David M. Hardy ("Hardy Decl."), R. 19-1, Pg ID # 97-792.  Plaintiff cross-moved for partial summary judgment, challenging the FBI's specific refusal to release 101 documents withheld in full and redaction of material from 40 documents.  Pl.'s Am. Corr. Brief in Supp. of Cross Motion for Partial Summ. J. ("Pl.'s Brief"), R. 33 Pg ID # 1616-61.  The FBI withheld in full: 75 maps depicting "population concentrations," "population centers," "population statistics" or "specific population type[s]"; 25 Domain Intelligence Notes ("DINs"), which "study[] the activities and actions of a particular group or element" in the field office's area of responsibility; and one threat analysis Program Assessment, which compiles "the work product of a large number of DINs and other research materials."  Hardy Decl., R. 19-1, ¶ 50, Pg ID # 121; Ex. L to Hardy Decl., R. 19-2, Pg ID # 764-92.  The FBI deleted material from 15 Program Assessments and 25 electronic communications ("ECs"), which

are "used to document the intelligence analysis and work product . . . used to create the [Program] Assessment or DIN." *Id*. ¶ 50, Pg ID # 121.[8]

Plaintiff principally argued that because the FBI determined that the contested records are responsive to the Request, they likely use and rely on publicly-available racial or ethnic information about Michigan communities that cannot be kept secret under FOIA Exemptions 7A or 1, and therefore must be segregated and disclosed. Pl.'s Brief, R. 33, at 14-29, Pg ID # 1638-53. Plaintiff contended that the Hardy Declaration failed to show that Defendants could not further segregate and disclose any non-exempt racial and ethnic information from the records, and that Defendants' prior release of precisely this type of information demonstrated that Defendants could do so. *Id*. at 15-29, Pg ID # 1639-53; Pl.'s Reply, R. 34, at 3-7, Pg ID # 1668-72. Finally, Plaintiff raised the concern that Defendants improperly relied on the FOIA's exclusion provision, 5 U.S.C. § 552(c)(3), to withhold responsive records. Pl.'s Brief, R. 33, at 31-35, Pg ID # 1655-59; Pl.'s Reply, R. 34, at 8-10, Pg ID # 1673-75. Plaintiff requested adjudication of this issue through a procedure akin to the "Glomar procedure"

---

[8] Plaintiff does not challenge the information withheld from one partially released EC documenting the opening of a domain management investigation into Michigan's "large Middle Eastern and Muslim population." Ex. K to Hardy Decl., R. 19-2, at DE-GEOMAP 484-85, Pg ID # 581-82.

established by the D.C. Circuit in *Phillippi v. C.I.A.*, 546 F.2d 1009 (D.C. Cir.

1976), in order to ensure meaningful judicial review and to protect the interests of

both litigants and the public.  Pl.'s Brief, R. 33, at 32-35, Pg ID # 1656-59; Pl.'s

Reply, R. 34, at 8-10; Pg ID # 1673-75.

Defendants principally argued that they could keep secret all of the contested

material, including any publicly-available racial and ethnic information, under

Exemption 7A as protected law enforcement records.  Defs.' Brief in Supp. of its

Motion for Summ. J.  ("Defs.' Brief"), R. 19, at 17-19, Pg ID # 80-82; Defs.'

Reply, R. 28, at 7-10, Pg ID # 1491-94.  They secondarily invoked Exemption 1 to

withhold certain information in approximately one-third of the records on the

ground that it is classified.  Defs.' Brief, R. 19, at 12-17, Pg ID # 75-80; Defs.'

Reply, R. 28, at 12-15, Pg ID # 1496-99.[9]  Defendants asserted that they could not

segregate and disclose any more non-exempt material.  Defs.' Brief, R. 19, at 30,

Pg ID # 93; Hardy Decl., R. 19-1, ¶ 93, Pg ID # 193-94.  And they requested that

the district court resolve the Section 552(c) dispute through in camera review of

---

[9] The FBI also asserted Exemptions 6, 7C, 7D, and 7E over certain portions
of records.  In their summary judgment motion, Defendants asked to provide the
district court with Exemption 7C, 7D, and 7E arguments in camera if they did not
prevail on their Exemption 7A claim.  *See* Defs.' Brief, R. 19, at 19 n.7, Pg ID
# 82.  Plaintiff did not oppose Defendants' Exemption 6, 7C, and 7D withholdings,
but objected to Defendants' proposed submission of in camera arguments on
Exemption 7E.  Pl.'s Brief, R. 33, at 14-15 & n.14, Pg ID # 1638-39.  Plaintiff
requested permission to present additional briefing if Defendants proceeded with
their proposal.  *Id.*

18

their ex parte declaration addressing their reliance, if any, on the FOIA's exclusion provision.  Defs.' Reply, R. 28, at 17-19, Pg ID # 1501-03.

On September 30, 2012, the district court granted Defendants' motion for summary judgment and denied Plaintiff's cross-motion.  Opinion and Order ("Opinion"), R. 35, Pg ID # 1677-96.  It upheld Defendants' Exemption 7A withholdings and determined that disclosure of Michigan communities' publicly-available racial and ethnic information could be expected to harm ongoing or pending investigations.  *Id*. at 14, Pg ID # 1690.  It also affirmed Defendants' Exemption 1 withholdings, without specifying whether Defendants properly kept secret publicly-available racial and ethnic information under this exemption.  *Id*. at 12, Pg ID # 1688.  Finally, the district court rejected Plaintiff's proposal for use of a Glomar-like procedure to resolve the parties' Section 552(c) dispute as "unnecessary."  Id. at 19, Pg ID # 1695.  It reviewed in camera Defendants' ex parte affidavit, and ruled that any reliance on a FOIA exclusion was justified.  *Id*. at 19-20, Pg ID # 1696.  Plaintiff timely appealed.  Notice of Appeal, R. 37, Pg ID # 1698-99.[10]

---

[10] The district court also ruled on Defendants' motion to dismiss the FBI as a party to the action, the parties' cross-motions for summary judgment on Plaintiff's search claim, and the propriety of Defendants' redaction of information from certain DIOG training materials under Exemption 7E.  Opinion, R. 35, at 4-6, 14-18, Pg ID # 1680-82, 1690-94.  The parties have not appealed these rulings, and they are not before this Court.

# SUMMARY OF THE ARGUMENT

This Freedom of Information Act case presents two critically important questions concerning FBI claims of secrecy regarding its use of expanded domestic surveillance powers.  The first concerns whether the FBI may keep secret publicly-available information about Michigan populations.  This information would shed necessary light on whether the FBI is using its expanded powers to illegally profile entire racial, ethnic, national origin, and religious communities.  The second concerns whether the FBI may secure a secret process to adjudicate a challenge to its possible reliance on the FOIA's exclusion provision, 5 U.S.C. § 552(c), to improperly keep secret information about this same surveillance program.  The answer to both questions is "no."

In the proceedings below, the district court accepted Defendants' sweeping claims to shield public source information from public view under FOIA Exemption 7A, which applies to law enforcement records, and Exemption 1, which applies to classified information.  In doing so, the district court failed to account for the nature of the information Plaintiff seeks.  Plaintiff requests disclosure from the withheld records of only public source information about Michigan communities, including their census data, population statistics, and demographics.  While disclosure of this information would inform the public about which

communities are subject to potentially improper FBI intelligence collection, it cannot be reasonably expected to harm current or pending investigations of specific targets, and cannot be kept secret under Exemption 7A.  Nor can the government keep this public source information secret under Exemption 1 because it does not constitute foreign relations information or intelligence sources or methods that, if disclosed, could plausibly cause national security harms. Moreover, contrary to Defendants' claims, neither Exemption 7A nor 1 apply to the limited public source information Plaintiff seeks because evidence in the record shows that Defendants have disclosed precisely this type of information from documents released in response to this Request and similar FOIA requests in other states.

The district court's decision to affirm Defendants' broad Exemption 7A claim of secrecy over publicly-available racial and ethnic information was thus based on an incorrect application of the law and interpretation of the facts. Although the district court did not specifically address whether Exemption 1 permits Defendants to keep secret public source information about Michigan communities, to the extent that its Exemption 1 holding is interpreted to do so, that decision was also incorrect as a matter of law and fact.

Because the public source information that Plaintiff seeks is not exempt, the key issue is whether Defendants properly justified their refusal to segregate and disclose it, as the FOIA requires. The district court also erred as a matter of law by failing to carry out this Court's directive to determine whether Defendants met this burden. The record shows that Defendants did not: their declarations claiming that they cannot segregate and disclose any additional non-exempt information are insufficiently detailed and refuted by evidence in the record. This Court should thus reverse the district court's Exemption 7A and 1 rulings as to any publicly-available racial and ethnic information in the withheld material and remand for a determination as to whether Defendants properly segregated and disclosed non-exempt information.

Finally, this case also provides this Court with a critically necessary occasion to fashion fair and transparent procedures for adjudicating Plaintiff's claim that Defendants possibly relied improperly on the FOIA's exclusion provision, 5 U.S.C. § 552(c) ("Section 552(c)"). Plaintiff challenged the propriety of Defendants' possible reliance on Section 552(c), which permits the government to avoid confirming or denying the very existence of responsive records. In the absence of circuit authority establishing procedures for resolving this claim, Plaintiff proposed use of a procedure akin to the well-known "Glomar" procedure,

22

which was established by the D.C. Circuit in *Phillippi v. C.I.A.*, 546 F.2d 1009 (D.C. Cir. 1976), and is routinely followed by courts around the country to accommodate the narrow circumstances in which an agency may properly refuse to confirm or deny the existence of records.

Under Plaintiff's proposal, Defendants would file a public statement indicating whether they interpret all or part of the Request as seeking records that, if they exist, are excludable under Section 552(c). If Defendants file a statement indicating that they *do* interpret portions of the Request to seek excludable records and therefore, have not processed those portions, the parties would then brief—and the district court would resolve—whether the type of information Plaintiff seeks, if it exists, is excludable. The district court would then set forth its conclusion and supportive reasoning in a public opinion. Defendants opposed this process and requested an entirely secret, ex parte one.

The district court rejected Plaintiff's proposal. It instead conducted in camera review of Defendants' ex parte declaration, and issued a public ruling stating that if Defendants' relied on any exclusion, such reliance was proper. In contrast to Plaintiff's proposed Glomar-like procedure, this one-sided and secret process prevented the district court from conducting meaningful judicial review after adversarial briefing, prevents this Court from conducting meaningful

appellate review, and for the reasons set forth below, fails to protect the government's interest in the secrecy of any reliance on a FOIA exclusion pending appeal in the event of an adverse judicial ruling.

This case therefore squarely calls for this Court to adopt procedures for adjudicating Section 552(c) disputes that accommodate both a FOIA plaintiff's ability to test the government's claim that Section 552(c) applies to a FOIA request and the government's interest in refusing to confirm or deny that it has relied on Section 552(c). This Court should thus vacate the district court's Section 552(c) ruling and remand for adjudication consistent with Plaintiff's proposal.

## **ARGUMENT**

### **I) FOIA and the Standard of Review**

Congress enacted the Freedom of Information Act, 5 U.S.C. § 552, "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978); *see also Schell v. U.S. Dep't of Health & Human Servs.*, 843 F.2d 933, 936 (6th Cir. 1988) (FOIA "was enacted to permit access to official information long shielded unnecessarily from public view.") (internal quotation marks omitted). FOIA requires federal agencies to respond to requests for information and to disclose

their records to the public, 5 U.S.C. § 552(a)(3)(A), (a)(6), subject to nine

enumerated exemptions, *id.* § 552(b).  Because "disclosure rather than secrecy is

the dominant objective of the Act," FOIA exemptions are "narrowly construed,"

*Akron Standard Div. of Eagle-Picher Indus., Inc. v. Donovan*, 780 F.2d 568, 571

(6th Cir. 1986), and agencies must release any reasonably segregable portion of a

withheld record.  5 U.S.C. § 552(b).

The agency bears the burden of proving that it properly withholds

information under a FOIA exemption.  *U.S. Dep't of Interior v. Klamath Water*

*Users Protective Ass'n*, 532 U.S. 1, 7-8 (2001).  To satisfy this burden, the agency

must submit what are now referred to as a *Vaughn* declaration and *Vaughn* index

setting forth the bases for each claimed FOIA exemption.  *See Vaughn v. Rosen*,

484 F.2d 820, 826–28 (D.C. Cir. 1973); *Jones v. F.B.I.*, 41 F.3d 238, 244 (6th Cir.

1994).  Because federal agencies tend to "claim the broadest possible grounds for

exemption for the greatest amount of information," the indices must provide "a

relatively detailed analysis" of the withheld material "in manageable segments"

without resort to "conclusory and generalized allegations of exemptions."  *Vaughn*,

484 F.2d at 826; *Rugiero v. U.S. Dep't of Justice*, 257 F.3d 534, 544 (6th Cir.

2001) (same).  "[A]s much information as possible" must be made public in

25

*Vaughn* indices to "enable[] the adversary system to operate." *Lykins v. Dep't of Justice*, 725 F.2d 1455, 1463 (D.C. Cir. 1984).

FOIA requires courts to undertake de novo review of an agency's decision to withhold documents. 5 U.S.C. § 552(a)(4)(B). This Court reviews de novo a district court's grant of summary judgment. *Rugiero*, 257 F.3d at 453. Summary judgment is proper if the record demonstrates "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Two FOIA exemptions are at issue in this litigation: Exemptions 7A and 1. 5 U.S.C. § 552(b)(1), (b)(7)(A).

Exemption 7A allows an agency to withhold law enforcement records or information, but only to the extent that disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). The agency must show that "release of information could reasonably be expected to cause some articulable harm" to current or pending enforcement proceedings. *Manna v. U.S. Dep't of Justice*, 51 F.3d 1158, 1164 (3d Cir. 1995). An agency may establish the application of Exemption 7A based on categories of withheld records, rather than specific documents. *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 789 F.2d 64, 67 (D.C. Cir. 1986). But, it must demonstrate, "by more than [a]

26

conclusory statement, how the particular kinds of investigatory records requested would interfere" with an enforcement proceeding." *Campbell v. U.S. Dep't of Health & Human Servs.*, 682 F.2d 256, 259 (D.C. Cir. 1982).

Exemption 1 allows an agency to withhold records that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy," and "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Here, the FBI relies upon the Executive Order on Classified National Security Information, Exec. Order No. 13,526, 3 C.F.R. 298 (2009) § 1.1(4), which governs how and what information federal agencies may classify as secret. The Executive Order provides that information may be classified if it falls within an authorized withholding category. *Id.* § 1.1(a)(3). In this case, the FBI relies upon the categories that permit the classification of "intelligence sources or methods," *id.* § 1.4(c), and information pertaining to foreign relations, *id.* § 1.4(d).

## II) <u>The District Court Erred in Allowing the FBI to Keep Secret Publicly-Available Racial and Ethnic Information About Michigan Communities.</u>

The heart of this dispute is Defendants' effort to keep secret publicly-available racial and ethnic information about Michigan communities that would reveal whether the FBI is using its expanded surveillance authority to illegally

profile communities for enhanced law enforcement scrutiny. Defendants concede that their withholdings include public source material, but advance sweeping Exemption 7A and 1 claims to entirely shield this information from public view. [11]

The district court held that Defendants could withhold public source racial and ethnic information under Exemption 7A because disclosure could reasonably be expected to harm current and pending investigations. Opinion, R. 35, at 12-14, Pg ID # 1688-70. This determination was an error. Disclosure of racial and ethnic information that is already publicly available would, at most, identify the communities subject to surveillance in the FBI's Domain Management program. But, it could not reasonably be expected to harm any specific law enforcement investigations because Plaintiff expressly does not seek information about target identities or conduct. Moreover, evidence in the record shows that Defendants have disclosed public source racial and ethnic information from documents

---

[11] *See, e.g.*, Hardy Decl., R. 19-1, ¶¶ 49, 53, Pg ID # 121-22 (identifying 32 records that contain "analysis" of "public source information"); *id.* ¶¶ 54-55, Pg ID # 123-24 (identifying 11 records created through use of "public source data"); *id.* ¶ 60 at 31, 32, 35-40, 43, Pg ID # 127-28, 131-36 (describing Program Assessments created using census reports or public source data or information); *id.* ¶ 60 at 33, 35, 36, 38, 39, Pg ID # 129, 131-32, 134-35 (describing Program Assessments including maps of "specific population concentrations" or "population data"); *id.* ¶ 60 at 44-47, Pg ID # 140-43 (47 maps documenting "population statistics", "population concentrations", "population centers" "population data from public sources" "specific population type[s]").

released in response to this Request and other similar FOIA requests, undermining their claims that further disclosures would cause harm.

The district court also upheld Defendants' claim that portions of a subset of the contested records can be kept secret under Exemption 1, without resolving whether these withholdings encompass U.S. census data or other racial or ethnic information that is already publicly-available. Exemption 1 simply does not apply to this information. Defendants do not show that public source information about Michigan communities itself constitutes classified foreign relations information or intelligence sources or methods, or that disclosure of this material would plausibly cause national security harm. Their arguments to the contrary are premised on the release of certain types of information that Plaintiff expressly does not seek and are contradicted by evidence in the record.

Because neither Exemption 7A nor Exemption 1 can shield from public view the public source information that Plaintiff seeks, the parties' final dispute boils down to whether Defendants carried out their obligation under the FOIA to segregate and disclose non-exempt information from properly withheld material. Controlling precedent of this Court required the district court to answer this question. In failing to even address this issue, the district court erred as a matter of law.

### A) Exemption 7A does not permit withholding publicly-available racial and ethnic information about Michigan communities because disclosure cannot reasonably be expected to harm investigations.

FOIA caselaw makes clear that Exemption 7A only permits the government to keep secret law enforcement records or information that cause "articulable" harm to current or pending enforcement proceedings. *Manna*, 51 F.3d at 1164. But, disclosure of the specific category of information that Plaintiff seeks—public source information about Michigan's racial and ethnic communities, including census data, population statistics, and demographic information—cannot reasonably be expected to cause any of the harms that Exemption 7A is designed to prevent. *See, e.g.*, *Dickerson v. U.S. Dep't of Justice*, 992 F. 2d 1426, 1433 (6th Cir. 1993) (witness intimidation); *Boyd v. Criminal Div. of the U.S. Dep't of Justice*, 475 F.3d 381, 386 (D.C. Cir. 2007) (revelation of "size, scope, and direction" of investigations, "destruction or alteration of relevant evidence," and "fabrication of fraudulent alibis").[12]

The district court incorrectly held otherwise. Opinion, R. 35, at 17, Pg ID # 1693. In doing so, it granted undue deference to Defendants' "inadequately

---

[12] Plaintiff does not dispute that the withheld records were compiled for law enforcement purposes or that Defendants may have identified current or pending investigations in some instances. *See Rugiero*, 257 F.3d at 550 (adopting "per se rule under which documents compiled by a law enforcement agency" satisfies Exemption 7's threshold requirement); *Manna*, 51 F.3d at 1164 (requiring pending or prospective law enforcement proceeding for Exemption 7A to apply).

supported," and sweeping assertion that disclosure of *any* material from records that contain *some* information consulted for current or prospective investigations could reasonably be expected to cause harm. *King v. U.S. Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1996); *see* Hardy Decl., R. 19-1, ¶ 59 at 30, Pg ID # 126 (claiming that "none of the information" can be released because the documents "contain information" consulted for investigations); Opinion, R. 35, at 13-14, Pg ID # 1689-90 (citing Hardy Decl. ¶ 59).  Its upholding of Defendants' claims of secrecy under Exemption 7A was based on an error of law and a misreading of the facts.

First, Plaintiff does not seek information about target identities or conduct, or any information from witness or informant statements.  Absent disclosure of this information, disclosure of the limited public source information that Plaintiff *does* seek—the names of Michigan racial or ethnic communities, their publicly-available census data, and their demographic information—cannot reasonably be expected to tip off targets or permit them to circumvent investigations.  This is particularly so because the information sought is public to begin with.  *Cf. Dickerson*, 992 F.2d at 1433 (government disclosed *public* source information from active investigation files and asserted Exemption 7A only over *non-public* information).

31

The district court thus reached an incorrect legal conclusion when it upheld Defendants' Exemption 7A claim by reasoning that release of "demographic information about specific ethnic groups in specific areas," would necessarily tip off targets because members of foreign terrorist organizations, gangs, and criminal organizations may share national origin or a common racial or ethnic background. Opinion, R. 35, at 14, Pg ID # 1690.  Even assuming that the race or ethnicity of a target may be "significant" to the investigations at issue, unless these characteristics are the sole or principal basis for the FBI's interest in a target (which would be prohibited under the DIOG), release of information about the racial or ethnic communities tracked by the FBI cannot be reasonably expected to alert targets or permit them to circumvent investigations.[13]

Second, the district court granted undue deference to the Hardy Declaration's assertions of harm in reaching its Exemption 7A ruling.  Opinion, R. 35, at 13-14, Pg ID # 1689-90.  It is true that an agency's declarations normally merit deference in a national security-related FOIA case.  *Jones*, 41 F.3d at 244; *Gardels v. C.I.A.*, 689 F.2d 1100, 1105 (D.C. Cir. 1982).  But, the government's

---

[13] Such targeting of investigations solely or principally on the basis of race or ethnicity is impermissible according to the FBI's own policies.  DOJ's Guidance on Race prohibits the use of race, ethnicity, national origin, or religion as the sole basis for investigation, and the DIOG itself prohibits "dominant" or "primary" reliance on these factors as a matter of FBI policy.  Ex. A to Choudhury Decl., R-24-2, at 30-31, Pg ID # 873-74 (DIOG, § 4.3(A)-(B)).

declarations do not merit deference when they lack "reasonable specificity of detail" or are "called into question[] by contradictory evidence." *Gardels*, 689 F.2d at 1105.[14]  The Hardy Declaration fails to meet both requirements.

The Hardy Declaration does not explain why disclosure of the limited and specific category of public information that Plaintiff seeks will cause articulable harm when information about target identities and conduct, and from informant and witness statements will remain secret.  Hardy Decl., R. 19-1, ¶ 59, Pg ID # 125-26.  Its assertion that disclosure of any of the information that Defendants keep secret will harm investigations is conclusory and inadequate to sustain their claim in the face of Plaintiff's specific challenge.  *See Campbell*, 682 F.2d at 259 (Exemption 7A requires more than a conclusory statement concerning harm resulting from disclosure of "particular kinds" of records).

Defendants' disclosure of publicly-available racial and ethnic information from documents similar to those they keep secret in this litigation also contradicts the Hardy Declaration's assertions of harm.  For example, the New Jersey FBI partially disclosed a chart of "New Jersey's top five Hispanic populated counties" and a map of populations from "El Salvador, Honduras, Guatemala" from a memorandum concerning the MS-13 gang.  *See* Ex. E to Choudhury Decl., R. 24-

---

[14] *See also Goldberg v. U.S. Dep't of State*, 818 F.2d 71, 77 (D.C. Cir. 1987) (even in the national security context, courts must not "relinquish[] their independent responsibility" to review an agency's withholdings).

7, at 1, 4, 11, Pg ID # 932, 935, 942.  If the FBI had withheld the name "MS-13"
and other information describing the gang or its conduct, disclosure of the fact that
the FBI was tracking New Jersey Central American and Hispanic populations
would not have revealed that MS-13 was the particular investigation target.  To
conclude otherwise would be to assume that ethnicity or national origin was the
*only* or *principal* basis for the FBI's interest in MS-13.[15]

Similarly, in response to the Request, the FBI disclosed a memorandum
documenting the opening of a suspicionless Domain Assessment investigation of
Michigan's "Middle-Eastern and Muslim population" based on its "large" size and
the unsupported assertion that these communities are "prime territory for attempted
radicalization and recruitment" by unspecified terrorist groups "originat[ing] in the
Middle-East and Southeast Asia."  Ex. K to Hardy Decl., R. 19-2 at DE-GEOMAP
484-85, Pg ID # 581-82. [16]  The San Francisco FBI disclosed an analogous

---

[15] In the court below, Defendants sought to distinguish this document by
arguing that it concerns a closed investigation.  Defs.' Reply, R. 28, at 9, Pg ID
# 1493.  But, this does not address the fact that absent release of information about
the target's identity or conduct, disclosure of information about the Central
American and Hispanic communities identified in the memorandum would not
have informed the particular target of any unknown investigations or investigatory
methods.

[16] "Domain Assessments" are FBI investigations that involve the collection
and use of communities' racial and ethnic information, but do not require a factual
predicate.  Ex. A to Choudhury Decl., R. 24-2, at 32-33, Pg ID # 875-76 (DIOG
§ 4.3(C)(2)); *id*. at 39, 45, Pg ID # 882, 888 (DIOG §§ 5.1, 5.4(A)(4)) (describing

memorandum documenting the opening of a Domain Assessment investigation of

Chinese and Russian populations based on the large size of the communities and

the fact that Chinese and Russian organized crime syndicates exist in that area.  Ex.

J to Choudhury Decl., R. 24-12, Pg ID # 984-87.  None of these disclosures reveal

the target identities or conduct, or any other information that would alert

unsuspecting targets about an investigation.  Nor do they inform targets of any

unknown investigatory methods because it is already widely known that the FBI

uses Domain Assessment investigations to collect, analyze, and map information

about racial and ethnic communities.  *See* Ex. A to Choudhury Decl., R. 24-2, at

32-33, Pg ID # 875-76 (DIOG §4.3(C)(2) permitting FBI collection and use of

racial and ethnic information in intelligence collection).  Yet, the disclosures *do*

reveal information of critical importance to the public: the fact that the FBI has

targeted entire communities for suspicionless intelligence collection simply

---

Type 4 domain assessments); 2008 Attorney General's Guidelines, *supra* n.2, at 7
(authorizing FBI to open domain assessments without objective information
suggesting the possibility of misconduct).

     The FBI's reasoning in opening this investigation into Michigan's Muslim
and Middle Eastern communities epitomizes unlawful profiling because it ascribes
criminal propensity to communities without any credible evidence to support
reasonable suspicion.  And this improper targeting of communities may lead to
even further profiling in light of the FBI's use of collected information for
targeting purposes and its expanded power to conduct and race- and ethnicity-
based investigations.  *See discussion supra* at 8-9.

because they share race, ethnicity, national origin, or religion with suspected

criminal or terrorist organizations.

The district court erred by ignoring the import of these disclosures and

granting undue deference to the Hardy Declaration's sweeping and unsupported

assertions of harm.  *See Gardels*, 689 F.2d at 1105.  As a result, its conclusion that

Exemption 7A applies to the specific public source information Plaintiff seeks is

based on both legal error and a critical misinterpretation of the factual record.

### B) Exemption 1 cannot justify withholding publicly-available racial and ethnic information about Michigan communities because disclosure will not plausibly harm national security.

Plaintiff does not dispute that Defendants may withhold the properly

classified portions of a subset of the contested documents under Exemption 1.  *See,*

*e.g.*, Hardy Decl., R. 19-1, Pg ID # 128-31, 133-38, 140, 144, 146, 148-51, 153,

155-60, 162 (invoking Exemption 1 over information "*within*" 12 Program

Assessments and 17 DINs) (emphasis supplied); *Id.*, Pg ID # 163-70 (invoking

Exemption 1 over information in certain pages of 11 ECs).[17]  But, Defendants do

not explain whether their specific Exemption 1 withholdings include public source

information, and Exemption 1 does not allow the withholding of entire records or

---

[17] Defendants also invoke Exemption 1 over material in 6 maps.  Hardy Decl., R. 19-1, Pg ID # 140-42.  Notably, the district court did not acknowledge that Defendants invoke Exemption 1 only over a subset of the withheld records. *See* Opinion, R. 35, at 8-12, Pg ID # 1684-88.

portions of records simply because they contain *some* classified information,

*Rugiero*, 257 F.3d at 553.  Because Defendants fail to show that disclosure of

publicly-available racial and ethnic information from records will plausibly cause

national security harm, Exemption 1 does not permit them to keep this information

secret.[18]  Although the district court did not specifically address this question—

presumably because it (incorrectly) concluded that Defendants can withhold this

information under Exemption 7A—the record is clearly inadequate to support

Defendants' Exemption 1 claim of secrecy over the public source information

Plaintiff seeks.  Therefore, to the extent that the district court's Exemption 1

holding encompassed this information, that holding was based on errors of law and

fact.

The Executive Order on Classified National Security Information requires

that information may be classified only if disclosure is reasonably expected to

result in damage to national security.  Exec. Order No. 13,526, 3 C.F.R. 298 (2009)

§ 1.1(4). Damage to the national security is defined as "harm to the national

---

[18] Defendants' descriptions make clear that the documents they seek to keep secret under Exemption 1 include public source information.  Hardy Decl., R. 19-1, ¶¶ 49, 53, Pg ID # 121-22 (identifying more than two dozen records withheld under Exemption 1 that contain "analysis" of "public source information"); *id*. ¶¶ 54-55, Pg ID # 123-24 (identifying eleven Program Assessments and DINs withheld under Exemption 1 and created through use of "public source data"); Ex. L to Hardy Decl., R. 19-2, Pg # 780 (map "[d]ocumenting population data from public source"); *id*. Pg # 783 (DIN "compiling information from . . . publicly available resources).

defense or foreign relations of the United States from the unauthorized disclosure of information." *Id*. at § 6.1(1).  FOIA caselaw makes clear that to withhold classified information under Exemption 1, the government must show a logical or plausible justification for why the disclosure of the information in question is likely to harm national security.  *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009).  The government's affidavits must describe the justification in sufficient detail and not be contradicted by evidence in the record.  *Id*.  Where, as here, the government seeks to keep secret information that is already in the public domain in whole or in part, it must explain how additional disclosure could damage the national security.  *See Wash. Post v. U.S. Dep't of Defense*, 766 F. Supp. 1, 9 (D.C. Cir. 1991) ("It is a matter of common sense that the presence of information in the public domain makes the disclosure of that information less likely to 'cause damage to the national security.'") (citation omitted).

The FBI catalogues a series of national security harms that purportedly will result from disclosure of any further material, including (presumably) public source racial and ethnic information from the records kept secret under Exemption 1.  But, the asserted harms lack any logical connection to the information Plaintiff seeks for three principal reasons.

First, Plaintiff does not want foreign relations information or intelligence sources or methods that are properly withheld under Exemption 1. Plaintiff seeks information about Michigan communities that is derived from domestic public sources, including the U.S. Census—not "intelligence information gathered . . . *about, or from a foreign country*" that "could injure diplomatic relations between the U.S. and *those countries*" if disclosed. Hardy Decl., R. 19-1, ¶ 54, Pg ID # 123-24 (emphasis added).[19] Nor does Plaintiff seek any research analysis or information secured pursuant to the Foreign Intelligence Surveillance Act or from witnesses, confidential sources, or the intelligence community, that Defendants want to keep secret as intelligence sources and methods. *Id*. ¶ 49, Pg ID # 120-21. Defendants fail to describe with the required specificity how public source information about Michigan communities would reveal any intelligence sources or methods. *See id*. ¶¶ 51-53, Pg ID # 121-23; *see Wilner*, 592 F.3d at 72 (agency affidavits must contain sufficient specificity and demonstrate that information "logically falls" within claimed exemption).

---

[19] Even if the public source racial or ethnic information concerns citizens of foreign countries, that information is not gathered "about or from a foreign country," and Defendants have shown that they can disclose this type of information without causing harm. Ex. G to Choudhury Decl., R. 24-9, Pg ID # 953-54 (disclosing statistics for foreign born populations from El Salvador, Guatemala, Honduras); Ex. H to Choudhury Decl., R. 24-10, Pg ID # 971 (disclosing population statistics for "foreign born Dominicans").

Second, Defendants' assertion that further disclosures would harm foreign relations and foreign activities of the United States is implausible because it is based on a fundamental mischaracterization of the information Plaintiff seeks. Because Plaintiff does not want "intelligence information gathered . . . about, or from a foreign country," disclosure of the limited information about Michigan communities that Plaintiff does want would not plausibly cause "diplomatic or economic retaliation against the United States," subvert U.S. intelligence activities regarding foreign countries, or "compromise cooperative foreign sources."  Hardy Decl., R. 19-1, ¶¶ 54-55, Pg ID # 123-24.  Nor has the disclosure of comparable publicly-available racial and ethnic information from documents released in response to similar FOIA requests caused such harms.  *See, e.g.*, Ex. E to Choudhury Decl., R. 24-7, at 1, 4, Pg ID # 932, 935-36 (statistics for populations from Mexico, Cuba, the Dominican Republic, Colombia, El Salvador, Guatemala, and Honduras).[20]

Third, it is similarly implausible that disclosure of information about Michigan's racial and ethnic communities that is already publicly available will

---

[20] *See also* Ex. F to Choudhury Decl., R. 24-8, Pg ID # 946-51 (statistics for populations from El Salvador, Guatemala, Honduras); Ex. G to Choudhury Decl., R. 24-9, Pg ID # 953-54 (same); Ex. H to Choudhury Decl., R. 24-10, Pg ID # 971 (population statistics for "foreign born Dominicans").

cause the national security harms Defendants associate with release of intelligence

sources and methods, absent the release of information Plaintiff does not seek—

information about target identities or conduct, or intelligence sources or activities,

as discussed above. *See supra* discussion 26-27; *see, e.g.*, Hardy Decl., R. 19-1,

¶ 51-52, Pg ID # 121-22 (claiming that further disclosures will reveal target

identities, permit targets to "go undetected," undermine intelligence activities, and

disclose investigation criteria or priorities). As a result of the FBI's release of the

DIOG and documents responsive to this Request and other similar FOIA requests,

the public is already well aware that the FBI collects and analyzes data about racial

and ethnic communities through its Domain Management program. *See* Ex. K to

Hardy Decl., R. 19-2, at DE-GEOMAP 484-85, Pg ID # 581-82 (Michigan's

Middle Eastern and Muslim populations); Ex. J to Choudhury Decl., R. 24-12, Pg

ID # 984-87 (San Francisco Chinese and Russian populations). It is implausible

that further evidence of this practice in Michigan will cause national security harm

by tipping off specific investigation targets. *See Lamont v. U.S. Dep't of Justice*,

475 F. Supp. 761, 772 (S.D.N.Y. 1979) (recognizing that if the subject of a FOIA

request has "already been specifically revealed to the public . . . there is no reason

such material cannot now be disclosed to [the plaintiff].")  Without a plausible

explanation for how disclosure of the public source information Plaintiff seeks

would harm national security, Defendants may not keep this information secret

under Exemption 1.  *See Wilner*, 592 F.3d at 73.

### C) <u>Defendants failed to meet their burden to segregate and disclose non-exempt, publicly-available racial and ethnic information about Michigan communities.</u>

This Court's controlling precedent is clear: an agency cannot withhold an

entire document simply because it contains some exempt material, and the agency

must show that it has followed the FOIA's directive to disclose "any reasonably

segregable" portions of a record.  *Rugiero*, 257 F.3d at 553 (discussing 5 U.S.C.

§ 552(b)).  The agency must offer a "detailed justification" for why non-exempt

information may not be segregated and disclosed, and indicate "what proportion of

the information in a document is non-exempt and how that material is dispersed

throughout the document."  *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*,

566 F.2d 242, 261 (D.C. Cir. 1977).  A district court errs when it approves of the

withholding of an entire document without ruling on whether the agency met this

burden.  *Rugiero*, 257 F.3d at 553.

The district court below failed to address whether Defendants met their

burden to segregate and disclose non-exempt information when it affirmed

Defendants' Exemption 7A and 1 withholdings.  This failure was an error of law

under this Court's precedent.  *Id.*

42

Had the district court reached the issue, it should have held that Defendants

failed to meet their FOIA burden for two reasons.

First, the publicly-available racial and ethnic information Plaintiff seeks is

not withholdable under Exemption 7A or 1, and Defendants' declarations do not

provide the "factual recitation" required to show that this information is not

reasonably segregable. *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 488 F.3d 178,

187 (3d Cir. 2007). The Hardy Declaration does not address what proportion of

each document contains non-exempt, public source information, how such

information is dispersed, or why it cannot be segregated and disclosed. Hardy

Decl., R. 19-1, ¶ 60, at 31-65, Pg ID # 127-61 (records withheld in full); *id*. ¶ 60 at

67-75, Pg ID # 163-71 (records withheld in part); *see Mead Data Cent., Inc.*, 566

F.2d at 261.[21]

Second, evidence in the record demonstrates that Defendants have

segregated and disclosed public source racial and ethnic information, including

census data and population statistics, from documents released in response to

similar FOIA requests. *See* Ex. K, Hardy Decl., R. 19-2, at DE-GEOMAP 484-85,

Pg ID # 581-82; Ex. E to Choudhury Decl., R. 24-7, at 1, 4, 11, Pg ID # 932, 935,

---

[21] This failure is particularly notable with respect to lengthy documents
acknowledged to contain public source information. *See* Ex. K to Hardy Decl., R.
19-2, Pg ID # 579 (describing 162-page document containing census data); *id*. Pg
ID # 588 (37-page document containing population information).

942; Ex. J to Choudhury Decl., R. 24-12, Pg ID # 984-87. This evidence shows that the public source information Plaintiff seeks is reasonably segregable. *Cf. Dickerson*, 992 F.2d at 1434 (recognizing segregation and disclosure of public source information from active investigation files). It also refutes the Hardy Declaration's claim to the contrary. *See Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1242 (D.C. Cir. 1991) (finding agency affidavit inadequate where evidence contradicted its assertions that no further non-exempt information could be segregated and disclosed).

To be clear, Plaintiff does not object to Defendants' withholding under Exemption 7A or 1 of particular portions of records that could reasonably be expected to harm investigations or that would plausibly harm national security. But the protection afforded these discrete materials does not justify Defendants' sweeping secrecy claims over all of the contested information.

This Court should thus reverse the district court's Exemption 7A and 1 holdings as to the publicly-available racial and ethnic information in the withheld records and remand with instructions that the district court determine whether Defendants carried out their burden to segregate and disclose all non-exempt information.

**III)** **This Court Should Establish a Fair and Transparent Process for Adjudicating Disputes Over an Agency's Possible Reliance on a FOIA Exclusion.**

This Court has not previously considered the procedures for adjudicating an agency's possible reliance on FOIA Section 552(c), which provides that in certain, limited circumstances, the FBI may treat otherwise responsive records "as not subject to the [FOIA] requirements"—without informing the FOIA requester. 5 U.S.C. § 552(c)(1)-(3). Litigation over the propriety of the government's reliance on Section 552(c) has proven challenging, however, because of the seemingly competing requirements that a FOIA plaintiff be able to test the government's legal claim that Section 552(c) applies while still allowing the government to refuse to confirm or deny that it has in fact relied on Section 552(c). In an essentially analogous situation, courts have used as a solution the so-called "Glomar" procedure established by the D.C. Circuit in *Phillippi v. C.I.A.*, 546 F.2d 1009 (D.C. Cir. 1976), and familiar to courts and litigants across the country.[22]

In the proceedings below, Plaintiff proposed that the district court use a Glomar-like procedure for resolving its Section 552(c) claim. The district court rejected Plaintiff's proposal. It instead reviewed in camera Defendants' ex parte

---

[22] The government's refusal to confirm or deny is known as the "Glomar response" and is named after the Hughes Glomar Explorer, an oceanic research vessel whose connection to the CIA was at issue in the case that established the doctrine. *See generally Phillippi*, 546 F.2d 1009.

declaration addressing their possible reliance on Section 552(c) in responding to the Request and granted Defendants summary judgment.  Opinion, R. 35, at 20, Pg ID # 1696.  This Court should reverse the district court's use of an entirely secret process and establish a transparent and fair procedure for resolving the Section 552(c) dispute in this case and future cases.

### A) Adjudication of the Section 552(c) dispute through a Glomar-like process will permit meaningful judicial review and protect the interests of the litigants and the public.

Plaintiff has a legitimate concern that Defendants improperly excluded responsive records in reliance on FOIA Section 552(c).  In the absence of controlling authority, Plaintiff proposed a method for adjudicating this concern that would permit meaningful judicial review while protecting the government's secrecy interest and the public interest in the judicial process.

FOIA Section 552(c)(3) permits the FBI to exclude records from disclosure if they are properly withholdable under Exemption 1 (permitting withholding of classified national defense or foreign policy information) and pertain to a foreign intelligence, counterintelligence, or international terrorism investigation, and if the very existence of the records is properly classified.  5 U.S.C. § 552(c)(3).  When a FOIA plaintiff challenges the FBI's reliance upon Section 552(c) to withhold responsive records, the court must determine "the applicability" of the exclusion to

the FOIA request.  *Benavides v. Drug Enforcement Agency*, 968 F.2d 1243, 1248-

49 (D.C. Cir. 1992), *modified on reh'g,* 976 F.2d 751 (D.C. Cir. 1992).[23]

Plaintiff is concerned that Defendants may have improperly relied on

Section 552(c)(3) in responding to the Request.  *See* Pl.'s Brief, R. 33, at 31-32, Pg

ID # 1655-56.  Defendants withhold documents concerning categories of

information that may fall within Section 552(c)(3): documents concerning foreign

intelligence or counterintelligence threats, Ex. L to Hardy Decl., R. 19-2, Pg ID

# 774-86; international terrorism crimes or threats, *id*. at Pg ID # 774-75, 777, or

foreign or international extremist groups or terrorist organizations, *id*. at Pg ID

# 766-67, 785, 788; and documents that if disclosed would purportedly harm

foreign relations or foreign activities of the United States, Hardy Decl., R. 19-1,

¶¶ 54-55, Pg ID # 123-24.  Plaintiff believes that related responsive documents

concerning foreign intelligence, counterintelligence, or international terrorism

investigations may exist, but Defendants improperly relied on Section 552(c)(3) to

exclude them.  Pl.'s Brief, R. 33, at 32, Pg ID # 1656.  Although it was not

required to do so, Plaintiff explained to the district court the basis for its concern.

*See id.* at 31-32, Pg ID # 1655-56.

---

[23] *See also* Harry A. Hammit, et al., Litigation Under the Federal Open
Government Laws 336 (2008) ("[J]udicial review may occur . . . when the
recipient suspects that the agency has resorted to the exclusion mechanism . . . .").

Plaintiff proposed that the district court adjudicate the propriety of any reliance on Section 552(c) through a procedure akin to the Glomar procedure, which is followed by circuit courts across the country to accommodate the narrow circumstances in which an agency may properly refuse to confirm or deny the existence of records. *See Phillippi*, 546 F.2d 1009 (D.C. Cir. 1976); *Wilner*, 592 F.3d at 68 (2d Cir. 2009); *Bassiouni v. C.I.A.*, 392 F.3d 244, 246 (7th Cir. 2004); *Minier v. C.I.A.*, 88 F.3d 796, 800-02 (9th Cir. 1996).

The normal FOIA practice requires an agency to search for responsive records, release non-exempt records, and then provide detailed justification for any withholdings to the requester and the court. *Vaughn*, 484 F.2d at 826-28 (D.C. Cir. 1973). In limited circumstances, where an agency claims that its very confirmation or denial of the existence of requested records would "cause harm cognizable under a FOIA exception," agencies are permitted to invoke the Glomar procedure. *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011). In these circumstances, an agency may respond to a FOIA requester by stating publicly that it interprets all or portions of the request as seeking records that, if they exist, would be exempt, and thus that it has not processed those portions of the request. *See, e.g.*, *id*. at 1171-72. The parties then brief, and the court resolves, the question

48

of whether the fact of the existence of the records sought is itself exempt from

disclosure.[24]

As in the Glomar context, an agency relying on Section 552(c)(3) believes

that the existence of the requested records is itself information that, if disclosed,

will cause harm.  *See* 5 U.S.C. § 552(c)(3).  Glomar-like procedures are thus

appropriately applied to preserve the government's secrecy interests while enabling

adjudication of a FOIA requester's claim that the government may have

improperly relied on an exclusion in responding to a request for records.[25]

Following such a process, the district court should have ordered Defendants

to respond to Plaintiff's concern that Defendants may have improperly relied upon

Section 552(c) with a Glomar-like response: a public court filing addressing

whether Defendants interpret all or part of the FOIA request as seeking records

that, if they exist, are excludable under Section 552(c), and that therefore, they

have not processed those portions of the request.  Just as in the Glomar context,

---

[24] *See, e.g.*, *Wolf v. C.I.A.*, 473 F.3d 370, 375 (D.C. Cir. 2007) (addressing whether the existence of agency records "constitutes information itself protected by either FOIA Exemption 1 or Exemption 3").

[25] Explanatory statements by the sponsoring representatives directly support this view.  *See* 132 Cong. Rec. H9455-05 (daily ed. Oct. 8, 1986) (statement of Rep. English and Kindness) (noting that purpose of Section 552(c) was to codify authority "to withhold the fact of the existence or nonexistence of specific records" as set forth in the Glomar case, *Philippi v. C.I.A.*, 546 F.2d 1009 (D.C. Cir. 19786)); 132 Cong. Rec. S14270-01 (daily ed. Sept. 30, 1986) (statement of Sen. Leahy) (same).

this statement would not reveal whether Defendants invoked Section 552(c) or whether they in fact even possess responsive records. If Defendants file a statement indicating that they *do* interpret the Request to seek records that would fall under Section 552(c), if they exist, Plaintiff would be free to argue that the types of records sought, if they exist, would *not* fall within the exclusion. The Court would determine, as courts commonly do in response to Glomar invocations, whether the type of information Plaintiff seeks, if it exists, falls within Section 552(c)'s language, and would set forth its reasoning in a public opinion.

The district court found Plaintiff's proposed Glomar-like procedure "unnecessary" because it could review in camera Defendants' ex parte declaration "to determine whether any exclusion was properly used." Opinion, R. 35, at 19-20, Pg ID # 1695-96. That conclusion ignored, however, the three critically important benefits of Plaintiff's proposed procedure.

First, a Glomar-like procedure would permit meaningful judicial review of Defendants' Section 552(c) invocation, if any, because the district court would benefit from both parties' briefing concerning the applicability of the exclusion to the type of information requested. *See Phillippi*, 546 F.2d at 1013 (recognizing that requiring an agency to "provide a public affidavit explaining in as much detail as is possible the basis for its [Glomar] claim" permits FOIA requester to test that

50

claim and "create[s] as complete a public record as is possible" to inform the court's determination).

Second, this procedure would also permit meaningful appellate review by resulting in a public opinion setting forth the factual and legal basis for the district court's answer to the question of whether the requested records, if they exist, fall within Section 552(c)'s statutory language. Such an opinion would permit Plaintiff to make an informed decision as to whether, and on what grounds, to appeal the district court's ruling, and would also provide this Court sufficient information for its review. *See Farrar v. Cain*, 642 F.2d 86, 87 (5th Cir. 1981) (per curiam) (findings of fact and conclusions of law "greatly facilitate appellate review"); *Jones v. Morris*, 777 F.2d 1277, 1281 (7th Cir. 1985) (written opinion "greatly facilitates the process of appellate review").

Third, the district court's public opinion would also protect the government's interest in secrecy because it would not disclose whether the agency actually treated any records as non-responsive under Section 552(c). Rather, as in the Glomar context, the opinion would simply address whether such records, if they exist, fall within the statutory language of Section 552(c). If Defendants prevail, the district court would issue a public opinion that states, at a minimum, "All or a portion of Plaintiff's FOIA request seeks the type of records that would

be excludable under Section 552(c), if any such records exist." If Plaintiff

prevails, the district court's public opinion would state, at a minimum, "All or a

portion of Plaintiff's FOIA request seeks the type of records that are not excludable

under Section 552(c), and therefore the government must process Plaintiff's

request to determine whether any such records exist." No matter the result, the

process would keep secret any government reliance on an exclusion.

The Glomar procedure thus would have allowed adversarial testing of a

critically important question—whether the Request seeks records that, if they exist,

fall within Section 552(c)(3)'s terms—while permitting the government to neither

confirm nor deny whether such records exist. It also would have allowed the

district court to issue a public ruling on that question without disclosing any

reliance on Section 552(c), thereby preserving the government's secrecy interest

pending either party's appeal.

> **B) The district court's use of secret proceedings prohibits meaningful judicial review and fails to protect the interests of the litigants and the public.**

The district court's use of ex parte, in camera proceedings to resolve the

Section 552(c) dispute in this case has launched the parties and this Court down a

path of secrecy with serious, negative consequences that call for this Court's

rejection of that approach in favor of alternative Glomar-like procedures.

First, the district court could not and did not conduct meaningful judicial review of the Section 552(c) issue.  Because it resolved this dispute through in camera review of Defendants' ex parte declaration, the district court did not benefit from both parties' briefing on the central legal question: whether the Request is properly interpreted to seek records that, if they exist, fall within Section 552(c)(3)'s statutory language.  *See Phillippi*, 546 F.2d at 1013 ("In camera examination has the defect that it is necessarily conducted without benefit of criticism and illumination by a party with the actual interest in forcing disclosure.") (internal quotation marks omitted).  There was no adversarial testing because Plaintiff had no meaningful opportunity to challenge any "rationale for withholding documents" in the ex parte affidavit.  *Kuzma v. I.R.S.*, 775 F.2d 66, 68-69 (2d Cir. 1985).  This lack of adversarial testing in turn undermined the district court's ability to conduct effective de novo review.  *See Wiener v. F.B.I.*, 943 F.2d 972, 977 (9th Cir. 1991) (trial judge cannot be expected "to do as thorough a job of illumination and characterization as would a party interested in the case.").

Second, the district court's use of a secret process resulted in the issuance of a bare order that does not permit meaningful appellate review because it fails to provide the factual or legal basis for the court's determination.  *See* Opinion, R. 35,

53

at 20, Pg ID # 1696 ("While neither confirming nor denying the existence of any exclusion, the Court finds and concludes that if an exclusion was . . . employed[,] it was and remains amply justified.") (internal quotation marks omitted); *cf. Granite Auto Leasing Corp. v. Carter Mfg. Co.*, 546 F.2d 654, 656 (5th Cir. 1977) (appellate court has no basis to affirm summary judgment when order is "opaque and unilluminating as to either the relevant facts or the law").  Such an order also denies Plaintiff the opportunity to make an informed decision whether to exercise its right to appeal or how to do so.[26]  This Court would thus have to review in camera Defendants' ex parte declaration in order to resolve an appeal, further extending the use of disfavored secret process and resolving a central, merits issue without the benefit of Plaintiff's advocacy.  *See Phillippi*, 546 F.2d at 1013 (discussing presumption in favor of resolving FOIA disputes through as public a process as possible); *Wiener*, 943 F.2d at 977 (adversary testing enables "effective judicial review"); *cf. Dep't of the Air Force v. Rose,* 425 U.S. 352, 361 (1976) (FOIA's "dominant objective" is "disclosure, not secrecy").

Third, even if this Court were to remand for issuance of a robust, sealed opinion to aid appellate review, this would promote wholly secret litigation, which is at odds with the spirit of FOIA and this Court's obligation to protect the public's

---

[26] Such bare orders would promote unnecessary appellate litigation because they fail to provide sufficient information to permit a FOIA requester to conclude that an appeal would be meritless.

right of access to the judicial process and its outcomes under the First Amendment and the common law.  *See, e.g.*, *Nixon v. Warner Commc'ns, Inc*., 435 U.S. 589, 597 (1978) (common law right of access to "judicial records and documents"); *Press-Enter. Co. v. Super. Ct. of Cal.*, 464 U.S. 501, 510 (1984) (presumption of public access to the activities of the judiciary under First Amendment is overcome only in the rarest and most compelling of circumstances); *Johnson v. Sherry*, 586 F.3d 439, 443 n.2 (6th Cir. 2009) (recognizing same).[27]

Fourth, the district court's secret procedure fails to protect the government's secrecy interest in the event of any adverse judicial rulings pending further appeal, thus creating an unworkable precedent for the resolution of future Section 552(c) disputes.  Had the district court ruled against Defendants after in camera review, it could not have issued *any* type of public ruling without disclosing the government's reliance on Section 552(c), thereby defeating the very interest the government sought to protect before it had an opportunity to appeal.  The court could not have reached a determination of impropriety unless Defendants had in fact relied on Section 552(c).  A public order parallel to the one that the district court issued would necessarily have revealed that Defendants had relied on Section 552(c), and that the reliance was improper.  So would the simplest order possible:

---

[27] *See also Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) ("strong presumption of access to . . . dispositive pleadings").

"Judgment for Plaintiff."  Even if the court had taken the extraordinary step of

sealing its judgment in addition to its opinion, this, too, would effectively have

disclosed Defendants' reliance because there would have been no need for a sealed

judgment unless Defendants had, in fact, relied on Section 552(c).[28]

These problems extend to the appellate level: if this Court determines, after

in camera review, that the district court erred, any resulting public opinion would

disclose Defendants' improper reliance on an exclusion, thereby failing to protect

Defendants' secrecy interest pending any ultimate reversal by the Supreme Court.[29]

And even if this Court were to review in camera Defendants' ex parte declaration

and conclude that the district court reached a substantively correct determination, it

should not endorse the adjudication of Section 552(c) disputes through secret

procedures that fail to account for the possibility that a lower court or this Court

may find the government's reliance on a FOIA exclusion improper in another case.

To do so would be to abdicate the FOIA's requirement that courts engage in robust

judicial review of agency decisions to keep information secret, including under

---

[28]A sealed judgment and opinion would be contrary to the First Amendment
and common law presumption of public access to judicial opinions. *See, e.g.*,
*Press-Enter. Co.*, 464 U.S. at 510; *Nixon*, 435 U.S. at 597.

[29] Although Supreme Court review of circuit court opinions is rare, this
Court should not endorse a procedure for adjudicating Section 552(c) disputes that
promises to always fail to permit meaningful judicial review and to protect the
government's secrecy interests in the event of an adverse ruling by a district court
or this Court.

Section 552(c).  *See* 5 U.S.C. § 552(a)(4)(B) (granting district courts "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant); *see also* 132 Cong. Rec. H9455-05 (daily ed. Oct. 8, 1986) (statement of Rep. Kindness) ("Agency actions pursuant to 5 U.S.C. § 552(c), like agency determinations to withhold acknowledged records pursuant to 5 U.S.C. 552(b), are subject to de novo judicial review.").

Plaintiff's proposed Glomar-like procedure avoids each of these negative consequences.  This Court should thus vacate the district court's Section 552(c) determination and remand for resolution according to Plaintiff's proposed procedure.

## CONCLUSION

For the foregoing reasons, the Court should: 1) reverse the judgment of the district court and hold that Defendants improperly withheld publicly-available racial and ethnic information under Exemption 7A; 2) reverse the judgment of the district court and hold that Defendants' Exemption 1 withholdings cannot encompass publicly-available racial and ethnic information; 3) remand with instruction that the district court determine whether Defendants discharged their burden to segregate and disclose all non-exempt information, including publicly-

57

available racial and ethnic information; 4) vacate the district court's ruling that

Defendants' reliance on Section 552(c)(3) in responding to the Request, if any, was

justified; and 5) remand with instructions that the district court adjudicate the

applicability of Section 552(c) to the Request through the Glomar-like procedure

described above.

s/Nusrat Choudhury
Nusrat Choudhury
Hina Shamsi
National Security Project
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7876
nchoudhury@aclu.org
hshamsi@aclu.org

Stephen C. Borgsdorf (P67669)
Dykema Gossett PLLC
Cooperating Attorneys, American Civil
  Liberties Fund of Michigan
2723 South State Street, Suite 400
Ann Arbor, MI 48104
(734) 214-7663
sborgsdorf@dykema.com

Mark P. Fancher (P56223)
Michael J. Steinberg (P43085)
American Civil Liberties Union Fund of
Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6822

mfancher@aclumich.org
msteinberg@aclumich.org

*Attorneys for Plaintiff*

February 1, 2013

# <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P.

   32(a)(7)(B) because:

   a. This brief contains 11,531 words, excluding the parts of the brief

      exempted by 6 Cir. R. 32(b)(1).

2. This brief complies with the typeface requirements of Fed. R. App. P.

   32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   a. This brief has been prepared in a proportionally spaced typeface using

      Microsoft Word with 14 Times New Roman.


February 1, 2013                          Respectfully submitted,
                                          <u>/s/ Nusrat J. Choudhury</u>
                                          Nusrat J. Choudhury
                                          National Security Project
                                          American Civil Liberties Union
                                            Foundation
                                          125 Broad Street, 18th Floor
                                          New York, NY 10004
                                          P: (212) 519-7876
                                          F: (212) 549-2654
                                          nchoudhury@aclu.org

                                          *Attorney for Plaintiff-Appellant*
                                          *American Civil Liberties Union of*
                                          *Michigan*

60

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 1, 2013, I electronically filed the foregoing

paper with the Clerk of the Court using the CM/ECF system, which will send

notice of this filing to all counsel of record at their registered e-mail addresses.


February 01, 2013                                   /s/ Nusrat J. Choudhury
                                                    Nusrat J. Choudhury
                                                    American Civil Liberties Union
                                                      Foundation
                                                    125 Broad Street, 18th Floor
                                                    New York City, NY 10004
                                                    P: (212) 519-7876
                                                    F: (212) 549-2654
                                                    nchoudhury@aclu.org

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record No. | Description of Document | Pg ID # |
|---|---|---|
| R. 1 | Complaint | 1-15 |
| R. 19 | Defs.' Motion for Summ. J. | 62 |
| R. 19 | Defs.' Brief in Supp. of its Motion for Summ. J. ("Defs.' Brief") | 64-95 |
| R. 19-1 | Declaration of David M. Hardy ("Hardy Decl.") | 96-194 |
| R. 19-2 | Ex. K to Hardy Decl. | 280-763 |
| R. 19-2 | Ex. L to Hardy Decl. | 764-792 |
| R. 24-1 | Declaration of Nusrat J. Choudhury ("Choudhury Decl.") | 848-852 |
| R. 24-2 | Ex. A to Choudhury Decl. | 853-891 |
| R. 24-7 | Ex. E to Choudhury Decl. | 931-945 |
| R. 24-8 | Ex. F to Choudhury Decl. | 946-951 |
| R. 24-9 | Ex. G to Choudhury Decl. | 952-967 |
| R. 24-12 | Ex. J to Choudhury Decl. | 984-987 |
| R. 24-18 | Ex. A to Declaration of Mark Fancher ("Fancher Decl.") | 1053-1058 |
| R. 28 | Defs.' Reply | 1481-1503 |
| R. 33 | Pl.'s Am. Corr. Brief in Supp. of Cross Motion for Partial Summ. J. ("Pl.'s Brief") | 1616-1661 |

| R. 34 | Pl.'s Reply | 1662-1676 |
|-------|------------|-----------|
| R. 35 | Opinion and Order ("Opinion) | 1677-1696 |
| R. 37 | Notice of Appeal | 1698-1699 |